IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GUY R. MARTINO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 08 C 4811 |
| | ) | |
| MCI COMMUNICATIONS SERVICES, | ) | |
| INC., d/b/a VERIZON BUSINESS | ) | |
| SERVICES, a Delaware Corporation,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On May 21, 2008, the Court granted Defendant Verizon Business Network Services,

Inc.'s ("Verizon Business") summary judgment motion as to Plaintiff Guy R. Martino's

("Martino") Age Discrimination in Employment Act ("ADEA") claim, 29 U.S.C. § 621 *et seq.,*

and declined to exercise its supplemental jurisdiction over Martino's state law claims. *See* 28

U.S.C. § 1367(c)(3). The Court presumes familiarity with its May 21, 2008, Memorandum,

Opinion, and Order granting Defendant's first summary judgment motion. (07 C 2627, R. 69-1.)

On June 6, 2008, Martino filed a four-count Complaint at Law in the Circuit Court of

Cook County, Illinois, Law Division, alleging state law claims of breach of contract, promissory

estoppel, unjust enrichment, and a claim under the Illinois Wage Payment and Collection Act,

820 ILCS 115/1 *et seq.* On August 22, 2008, Verizon Business removed Martino's Complaint to

---

[1] Verizon Business Network Services, Inc. ("Verizon Business") is the proper Defendant in this matter because Verizon Business is the business entity that was formed following a merger between MCI Communications and Verizon Communications on January 6, 2006. (R. 16-1, Def.'s Rule 56.1 Stmt. Facts ¶ 1.)

federal court pursuant to 28 U.S.C. § 1441(a) based on the Court's diversity jurisdiction. 28

U.S.C. § 1332(a). Before the Court is Verizon Business' Motion for Summary Judgment

pursuant to Federal Rule of Civil Procedure 56. For the following reasons, the Court grants

Verizon Business' summary judgment motion in its entirety. The Court denies Verizon

Business' motion to strike as moot.

## BACKGROUND

### I.    Martino's Position

In late 2004, Martino applied for a job at MCI Network Services, Inc. and interviewed

with Bob Gross, the Regional Sales Director for the Midwest Region, for an open sales

representative position in December 2004 or January 2005. (R. 16-1, Def.'s Rule 56.1 Stmt.

Facts ¶ 3.) Gross then offered Martino a position in MCI's Enterprise Hosting and Data Center

Services Group after which Martino reported directly to Gross. (*Id.* ¶ 4; R. 18-1, Pl.'s Rule 56.1

Stmt. Add'l Facts ¶ 1.) In return for providing services as a sales representative, MCI paid

Martino a base salary of $80,000, plus commissions, benefits, and expenses. (Def.'s Stmt. Facts

¶ 5.) The 2005 Commissions Plan contained a 300% cap on commissions. (*Id.* ¶ 6.)

Martino served as a product-knowledge or service-knowledge specialist for hosting and hosting-

related products and services, and his title was Business Solutions Consultant ("BSC"). (*Id.* ¶ 2;

Def.'s Stmt. Facts ¶ 7.) His position was considered an "overlay" position because he overlaid

and assisted the core sales teams that handled the named accounts. (Pl.'s Stmt. Facts ¶ 1; Def.'s

Stmt. Facts ¶ 8.) In general, a core sales representative – rather than a BSC – "quarterbacked"

the entire sales process, owned the client relationship, and owned all of the components that

made up the sale process. (Def.'s Stmt. Facts ¶ 8.) Meanwhile, Martino tagged to the premier

sales representatives, who had accounts that could generate $1,000,000 per month in monthly recurring charges. (Pl.'s Stmt. Facts ¶ 1.)

## II.    BP Amoco Deal

In mid-2005, Verizon Business formed a sales team in an attempt to secure business from BP Amoco, a worldwide energy company. (Def.'s Stmt. Facts ¶ 9.) Martino participated in the BP Deal as a sales representative in the IT Hosting Solutions division that "overlaid" with the core sales branch responsible for the deal. (*Id*.) In attempting to secure BP's business, Verizon Business was required to respond to a request for proposal ("RFP") issued by BP. (*Id.* ¶ 10.) One of the "major initiatives" expected of a BSC at Verizon Business was to assist the core sales team in the RFP process. (*Id*.) David Schiffman was the core sales representative principally responsible for the BP Deal. (*Id*. ¶ 11.) Steven Rumstein also played an important role in the BP Deal and Martino met with Rumstein on a regular basis. (*Id.* ¶ 13.) In October 2005, BP and Verizon Business signed a contract. (*Id*. ¶ 16.)

## III.    Martino's 2006 Compensation Plan

After the merger between MCI and Verizon in January 2006, Martino became a Business Solutions Consultant III ("BSC III"). (*Id.* ¶ 32.) Martino's commissions in 2006 were set forth in two policy documents: (1) the 2006 Verizon Business Specialized Services Hosting Solutions Compensation Plan (the "BSC Plan"); and (2) the Verizon Business 2006 Sales Compensation Policies (the "Compensation Policies") (collectively the "2006 Compensation Plan"). (*Id.* ¶ 33.) The statement of acceptance at the end of the 2006 BSC Plan states as follows:

> I understand that Verizon Business may amend, supplement, supersede, or terminate this Compensation Plan at any time with the appropriate notice according to local law. The Compensation Plan, including all related materials and documentation, is neither a contract nor a guarantee of employment or

compensation of any kind.  The Compensation Plan, including all materials and documentation, is simply a statement of management's general intent and does not, and shall not be construed to, constitute any promises or guarantees regarding your compensation, including but not limited to, the amount of sales compensation or the methodology used to compute such compensation.

(*Id.* ¶ 34.).  Martino signed this statement of acceptance on March 30, 2006, acknowledging that

he had received, read, and understood the terms of the BSC Plan and Compensation Policies.

(*Id.* ¶ 35.)  Section 6.3 of the Compensation Policies is entitled "Not A Contract."  (*Id.* ¶ 38.)

This section specifically states:

No statement contained in this Compensation Plan, or in any other Verizon Business Plan, policy or procedure, constitutes a contract of employment, express or implied; nor does any statement in this Compensation Plan constitute a guarantee of employment, continued employment, or any payment or benefits of any kind whatsoever.

(*Id.*)

Section 2.1 of the Compensation Policies, entitled "Eligibility," provides who is

eligible to earn commissions under the Compensation Plan.  (*Id.* ¶ 37.)  Section 2.1.3 specifically

sets forth what is known as the 15th/16th rule, which provides that "[w]hen leaving the

Compensation Plan (i.e. Leave of Absence or Termination) or transferring from one

Compensation Plan to another, individuals must remain in the current position through the 16th

calendar day of the month in order to receive full compensation for the current month's

performance."  (*Id.*)

## IV.    200% Cap in 2006 Compensation Plan

Under the 2006 Compensation Plan, Verizon Business provided its BSCs with a target

commission, which was "the annual commission amount that Plan Participants receive should

they achieve 100% of their performance objectives."  (*Id.* ¶ 40.)  The target commission for a

BSC III under the Compensation Plan was $60,000. (*Id.*) A BSC's target commission is comprised of two components: (1) the Sales Component, which accounts for 80% of a BSC's target commission; and (2) the CPE Component, which accounts for the remaining 20% of the BSC's target commission. (*Id.* ¶ 41.) Section 5.6 of the Compensation Policies, entitled "200% Performance Review," states:

> Each component of the Compensation Plan is subject to a 200% performance review by the Commission Review Board. The Commission Review Board will review all factors contributing to the Plan Participant's performance and determine whether an adjustment (increase) to the objective is appropriate. Once a Plan Participant reaches 200% of his/her annualized Sales, CPE or Revenue objective, results for that commission component will be frozen at 200% of annual or annualized Sales, CPE Sales or Revenue performance. Commissions will not be calculated for that component until the review process is completed and a course of action is determined. The review process for the Revenue Component will not be completed until final year-end performance is calculated.

(*Id.* ¶ 42.) Section 7.1 of the BSC Plan, also entitled "200% Performance Review," contains a nearly-identical provision. (*Id.*; Pl.'s Stmt. Facts ¶ 17.)

The Compensation Plan contains "payout factors" on both the CPE and the Sales Components, which accelerate commission payments when the BSC attains certain performance objectives. (Def.'s Stmt. Facts. ¶ 43.) The payout factor on the Sales Component for a BSC III who achieves 200% performance is 1.5. (*Id.*) The payout factor for the CPE Component – called an "Incremental Payout Value" – for a BSC III is expressed in the following chart:

| Payout Factor for BSC II on CPE Component | |
|---|---|
| Above 100% | $180 |
| 100% and below | $120 |

(*Id.*) Pursuant to Section 6.1 of the BSC Plan, the payout factors on the CPE Component are "prorated based on the Plan Participant's time in the BSC position." (*Id.* ¶ 44.) The payout

factor on the CPE Component is applied to each "percentage point." (*Id.* ¶ 45.) Thus, if a BSC III achieved over 100% attainment of his annual performance objective, the percentage points up to 100% are multiplied by the payout factor for "100% and below" and then added to the product of the percentage point attainment above 100% and the "Above 100%" payout factor. (*Id.*) In 2006, Verizon Business paid Martino $144,000 in commissions on the Sales Component and $12,500 in commissions on the CPE Component, which was the most Verizon Business could pay Martino under the terms of the 200% cap without the Compensation Review Board's approval to go over the 200% cap. (*Id.* ¶¶ 42, 46, 47.)

## V. Commissions Above the 200% Cap

Martino and his manager Bob Gross discussed Martino's commissions from the BP Deal sometime before October 2005, but prior to the publication of the 2006 Compensation Plan. (*Id.* ¶ 48; Pl.'s Stmt. Facts ¶ 19.) Martino testified that Gross told him that if there were caps on commissions in the 2006 Compensation Plan, Gross would work towards making sure Martino would get an exception to the cap. (Def.'s Stmt. Facts ¶ 48.) Martino also maintains that he spoke with Verizon Business' Vice President Paul Jacobi regarding his potential commissions from the BP Deal in late 2005 or early 2006 before the publication of the 2006 Compensation Plan. (*Id.* ¶ 49; Pl.'s Stmt. Facts ¶ 19.) Martino asserts that Jacobi told him that the BP Deal was going to make Martino a lot of money and that Jacobi provided a "projection" for Martino's potential commissions from the BP Deal in 2006 – which was greater than the amount Martino was actually eligible to receive once Verizon Business published the 2006 Compensation Plan. (Def.'s Stmt. Facts ¶ 49; Pl.'s Stmt. Facts ¶ 21.) During this conversation, Jacobi did not refer to the 200% cap provisions of the 2006 Compensation Plan. (Def.'s Stmt. Facts ¶ 49.)

Also, Martino testified that Gross interpreted the "200% Performance Review" provision of the BSC Plan at a weekly team meeting conference call held shortly after Martino received the 2006 Compensation Plan, stating:

> My recollection is that [Gross] read the last sentence, which is that, "The review process for the revenue component will not be completed until final year end performance is calculated," and then said, "What that means is at the end of the year they're going to calculate your final year end performance. And if your final year end performance does in fact go above 200 percent . . . then you'll be paid accordingly.

(*Id.* ¶ 50.) Martino admits, however, that he did not ask Gross whether Gross' alleged interpretation of the provision was also the interpretation of the Sales Compensation Executive Counsel and Martino never received a policy document from the Sales Compensation Executive Counsel that corresponded with Gross' interpretation. (*Id.* ¶ 51.)

## VI. Martino's January 2006 Leave

In January 2006, Martino worked on January 3, the first business day of the month, and then had open-heart surgery on January 5, 2006. (*Id.* ¶ 53; Pl.'s Stmt. Facts ¶ 14.) After he returned to work near the end of January 2006, Martino spoke with Human Resources Representative Jeanette Bustos before signing his leave of absence forms and asked Bustos if he could use sick days and/or vacation days in lieu of going on a leave of absence. (*Id.* ¶ 55.) Bustos explained to Martino that because a major surgery was involved and he was under a doctor's care, he must take a leave of absence. (*Id.* ¶ 55.) On January 31, 2006, Martino received an email stating that he was not be eligible for commission credit in January 2006 because the Compensation Plan required him to begin his leave of absence after the 15th day of the month in order to earn sales credits for that month. (*Id.* ¶ 56; Pl.'s Stmt. Facts ¶¶ 15-16.)

## VII. Verizon Business' Reduction-in-Force

MCI Communications and Verizon Business merged in January 2006. (Def.'s Stmt. Facts ¶ 24.) In June 2006, Ed Franklin, Vice President of IT Solutions, and Fran Snyder, Business Manager of IT Services, asked Rumstein to submit a list of individuals whom Rumstein believed would contribute least to Verizon Business going forward to place on a reduction-in-force ("RIF") list because the newly-merged company needed to reduce costs. (*Id.* ¶¶ 25, 26.) Rumstein considered a "number of factors" in determining which BSCs to place on the RIF list, including: (1) the BSC's demonstrated ability to travel funneled-up managed services and sell the company's complete product portfolio; (2) the BSC's credibility working with the core sales organization; (3) the BSC's demonstrated ability in the past, such as whether the BSC had sold across multiple services, fully penetrated a number of accounts, and positioned him or herself well in those accounts; and (4) the BSC's actual sales performance. (*Id.* ¶ 27; R. 18-1, Pl.'s Resp. Def.'s Stmt. Facts ¶ 27.) After Rumstein created the RIF list, which included Martino's name, he submitted it to Snyder on June 15, 2006. (*Id.* ¶ 29.) After receiving Rumstein's list, Franklin selected Martino for the RIF. (*Id.* ¶ 30.) Verizon Business terminated Martino's employment effective July 14, 2006. (*Id.* ¶ 31.) Martino worked for MCI Communications and Verizon Business for approximately 18 months. (*Id.* ¶¶ 4, 31.)

**SUMMARY JUDGMENT STANDARD**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P 56(c). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 127 S.Ct. 1769, 1776 (2007). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby*, 477 U.S. at 255 (quoting Fed R. Civ. P. 56(e)).

## ANALYSIS

### I. Breach of Contract – Count I

In Count I of his Complaint, Martino's argues that Verizon Business is liable for breach of contract for failing to pay him his outstanding 2006 commissions based on Verizon's Business 2006 Specialized Services Hosting Solutions Compensation Plan (the "BSC Plan") and the Verizon Business 2006 Sales Compensation Policies (the "Compensation Policies"). The parties do not dispute that Illinois law controls Martino's state law claims, including Martino's breach of contract claim as alleged in Count I of the Complaint.

Illinois courts adhere to the "four corners rule" of contract interpretation, which provides that "an agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence." *Camico Mut. Ins. Co. v. Citizens Bank,* 474 F.3d 989, 992-93 (7th Cir. 2007) (quoting *Davis v. G.N. Mortgage Corp.,* 396 F.3d 869, 878 (7th Cir. 2005)); *see also Air Safety, Inc. v. Teachers Realty Corp.,* 185

Ill.2d 457, 236 Ill.Dec. 8, 706 N.E.2d 882, 884 (1999). In other words, Illinois courts interpret

unambiguous contract terms according to their plain meaning. *Camico Mut Ins.,* 474 F.3d at

993; *Utility Audit, Inc. v. Horace Mann Serv. Corp.,* 383 F.3d 683, 687 (7th Cir. 2004). A

contract provision is ambiguous if it is subject to more than one reasonable interpretation. *See

PPM Fin., Inc. v. Norandal USA, Inc.,* 392 F.3d 889, 893 (7th Cir. 2004) (citing *Lapham-Hickey

Steel Corp. v. Prot. Mut. Ins. Co.,* 166 Ill.2d 520, 211 Ill.Dec. 459, 655 N.E.2d 842, 846 (1995)).

Under Illinois law, the interpretation of an unambiguous contract is a question of law. *Utility

Audit, Inc.,* 383 F.3d at 687. Moreover, the "question of the existence of a contract is a matter of

law for determination by the court." *Association Benefit Servs., Inc. v. Caremark RX, Inc.,* 493

F.3d 841, 849 (7th Cir. 2007) (citation omitted).

"Illinois law presumes that an employee hired for an indefinite period may be discharged

at will for any reason." *Moss v. Martin,* 473 F.3d 694, 700 (7th Cir. 2007). Illinois courts,

however, recognize that "employment handbooks have the potential to form contracts between

employers and workers." *Id.* (citing *Duldulao v. Saint Mary of Nazareth Hosp. Ctr.*, 115 Ill.2d

482, 106 Ill.Dec. 8, 505 N.E.2d 314, 317-18 (Ill. 1987)). Specifically, an employment handbook

may give rise to an enforceable contract "if the traditional requirements for contract formation

are present," including (1) "the language of the policy statement must contain a promise clear

enough that an employee would reasonably believe that an offer has been made;" (2) "the

statement must be disseminated to the employee in such a manner that the employee is aware of

its contents and reasonably believes it to be an offer;" and (3) "the employee must accept the

offer by commencing or continuing to work after learning of the policy statement."

*Duldulao,*115 Ill.2d at 490; *see also Kiddy-Brown v. Blagojevich,* 408 F.3d 346, 364 (7th Cir.

2005) ("a written employee handbook, promulgated by an employer and outlining 'Personnel Policies' and the 'rights and duties' of employees, can transform an at-will employment relationship to a permanent one and can create 'enforceable contractual rights if the traditional requirements for contract formation are present'") (citation omitted).  Illinois law also recognizes that "disclaiming language in an employee handbook precludes the formation of an employment contract." *Davis v. Times Mirror Magazines, Inc.,* 297 Ill.App.3d 488, 498, 231 Ill.Dec. 826, 697 N.E.2d 380 (Ill.App.Ct. 1998).  In other words, "where the employee manual contains a disclaimer indicating that the manual promises nothing and does not act as a contract, no enforceable contractual rights will be conferred on the employee based on that manual." *Ivory v. Specialized Assistance Serv., Inc.,* 365 Ill.App.3d 544, 546, 302 Ill.Dec. 793, 850 N.E.2d 230 (Ill.App.Ct. 2006).

Here, Martino argues that the language of the Compensation Plan reasonably led him to believe that there was an employment contract.  Instead of arguing that he has fulfilled the three *Duldulao* conditions of contractual formation as set forth above, Martino argues that the disclaimers in the 2006 Compensation Plan were not conspicuous, and thus the Compensation Plan is a valid, enforceable contract.  *See Wheeler v. Phoenix Co. of Chicago,* 276 Ill.App.3d 156, 161, 213 Ill.Dec. 62, 658 N.E.2d 532 (Ill.App.Ct. 1995) ("only conspicuous disclaimer language negates promises made in an employment manual or policy statement.").  The provisions at issue include the statement of acceptance at the end of the 2006 BSC Plan, which Martino signed:

> I understand that Verizon Business may amend, supplement, supersede, or terminate this Compensation Plan at any time with the appropriate notice according to local law.  ***The Compensation Plan, including all related materials and documentation, is neither a contract nor a guarantee of employment or***

**compensation of any kind.** The Compensation Plan, including all materials and documentation, is simply a statement of management's general intent and does not, and shall not be construed to, constitute any promises or guarantees regarding your compensation, including but not limited to, the amount of sales compensation or the methodology used to compute such compensation.

(Def.'s Stmt. Facts ¶ 34.) (emphasis added). This paragraph – which is clearly worded – was part of the "Statement of Acceptance" that Martino signed on March 30, 2006. (Def.'s Stmt. Facts ¶ 35; *see also* Ex., J, 2006 BSC Plan, at 11.) In addition, this section was preceded by Section 7.4, entitled "At-Will Employee Status" that states in relevant part:

Neither this Plan nor anything contained in it shall affect your status as an employee-at-will of Verizon Business. ***This Plan is not intended in any way to create, and does not create, a durational term of employment or an employment contract, expressed or implied, between you and Verizon Business.***

(*Id*. at 10.) (emphasis added). In the BSC Plan, Section 7.4 is conspicuously printed in bold. (*Id.*) In addition, Section 6.3 of the Compensation Policies, entitled "Not A Contract," specifically states:

***No statement contained in this Compensation Plan, or in any other Verizon Business Plan, policy or procedure***, ***constitutes a contract of employment***, ***express or implied***; nor does any statement in this Compensation Plan constitute a guarantee of employment, continued employment, or any payment or benefits of any kind whatsoever.

(Def.'s Stmt. Facts ¶ 38.) (emphasis added). This section of the Compensation Policies is conspicuous because the heading "Not a Contract" was in bold and the section was separated from other topics, such as the "at-will" notice. (Def.'s Ex. K., Comp. Policies, at 29.)

These unambiguous, clearly-designated disclaimers sufficiently establish that the Compensation Plan did not create an employment contract between Martino and Verizon Business. *See Moss,* 473 F.3d at 701; *see also Workman v. United Parcel Serv., Inc.*, 234 F.3d 998, 1000 (7th Cir. 2000) ("a disclaimer, if clear and forthright ... is a complete defense to a suit

for breach of contract based on an employee handbook.").  Because these unambiguous disclaimers do not give rise to a reasonable belief that Verizon Business made an offer to Martino as required under *Duldulao*, Martino's contractual claim fails.  *See Tatom v. Ameritech Corp.,* 305 F.3d 737, 744 (7th Cir. 2002).  Finally, the Court need not rely on "parol evidence" as Martino suggests because the Compensation Plan is clear on its face.  *See Camico Mut Ins.,* 474 F.3d at 993.  The Court thereby grants Defendants' summary judgment motion as to Count I of Martino's Complaint.

## II.     Promissory Estoppel – Count III

In the alternative to his breach of contract claim, Martino brings a claim based on the equitable doctrine of promissory estoppel in Count III of his Complaint seeking commissions on his qualified sales in excess of the 200% performance objective.  Martino bases his promissory estoppel claim on his manager Bob Gross' interpretation of the "200% Performance Review" provision of the BSC Plan, which Martino described as follows:

> My recollection is that [Gross] read the last sentence, which is that, "The review process for the revenue component will not be completed until final year end performance is calculated," and then said, "What that means is at the end of the year they're going to calculate your final year end performance.  And if your final year end performance does in fact go above 200 percent . . . then you'll be paid accordingly.

(Def.'s Stmt. Facts ¶ 50.)  Further, Martino testified at his deposition that Gross told him that if there were caps on commissions in the 2006 Compensation Plan, Gross would work to make sure that Martino would get an exception to the cap.  (*Id*. ¶ 48.)  Martino also bases his promissory estoppel claim on Vice President Paul Jacobi's statement that the BP Deal was going to make Martino a lot of money and Jacobi's "projection" for Martino's potential commissions from the BP Deal in 2006 – which was greater than the amount Martino was actually eligible to

receive once Verizon Business published the 2006 Compensation Plan.  (*Id.* ¶ 49; Pl.'s Stmt. Facts ¶ 21.)

To establish a promissory estoppel claim under Illinois law, Martino must prove that:  (1) Verizon Business made an unambiguous promise to him; (2) Martino reasonably relied upon the promise; (3) Martino's reliance was expected and foreseeable to Verizon Business; and (4) Martino relied on the promise to his detriment.  *See Dumas v. Infinity Broad. Corp.,* 416 F.3d 671, 677 (7th Cir. 2005) (citing *Quake Constr., Inc. v. American Airlines, Inc.,* 141 Ill.2d 281, 309-10, 152 Ill.Dec. 308, 565 N.E.2d 990 (Ill. 1990)).  "Under Illinois law, a claim for promissory estoppel will only succeed where all the other elements of a contract exist, but consideration is lacking."  *Dumas,* 416 F.3d at 677 (citation omitted).  Put differently, the "function of the doctrine of promissory estoppel is to provide an alternative basis to consideration for making promises legally enforceable."  *Workman,* 234 F.3d at 1001.

Assuming Gross' and Jacobi's statements are true for purposes of this motion, Verizon Business argues that both Gross' and Jacobi's "promises" to Martino are ambiguous, and thus Martino has failed to establish the first element of promissory estoppel under Illinois law. Specifically, Martino characterized Gross' comments made during a weekly team meeting as Gross' "interpretation" of the 200% Performance Review provision.  (Def.'s Stmt. Facts ¶ 50.) Prior to the publication of the 2006 Compensation Plan, Martino testified that Gross was "speculating" about the Compensation Plan.  (*Id.* ¶ 48; Ex. D, Martino Dep., at 13.)  In addition, during Martino's conversation with Jacobi before the publication of the 2006 Compensation Plan, Jacobi never mentioned the 200% cap provision when he offered a "projection" for Martino's potential commissions based on the BP Deal.  (*Id.* ¶ 49.)  Gross' interpretation and

14

speculation, as well as Jacobi's projection do not amount to a clear and definite promise – unambiguous in its terms – that Verizon Business would pay Martino commissions above the 200% cap. *See Stringer Const. Co., Inc. v. CHA,* 206 Ill.App.3d 250, 260, 150 Ill.Dec. 692, 563 N.E.2d 819 (Ill.App.Ct. 1990) ("prediction, opinion or prophecy is not a promise."). In short, Gross' and Jacobi's statements as characterized by Martino are too general to constitute an unambiguous promise as required under the first element of a promissory estoppel claim. *See Dougherty v. Akzo Nobel Salt, Inc.,* 47 F.Supp.2d 989, 991 (N.D. Ill. 1999)(determination of whether promise is unambiguous need not be made by jury). As such, Martino has failed to set forth evidence raising a genuine issue of material fact that Gross and Jacobi made unambiguous promises that Verizon Business would pay him commissions above the 200% cap. *See Sembos v. Philips Components,* 376 F.3d 696, 704 (7th Cir. 2004) ("Under Illinois law, promissory estoppel requires proof of the existence of an unambiguous promise.").[2]

Next, Verizon Business argues that it could not have expected or foreseen Martino's reliance on Jacobi's projection or Gross' speculation and interpretation because these interpretations were not made by individuals who had the authority to make them. Specifically, the "Interpretations" provision of the 2006 Compensation Plan states that "[f]inal interpretations of any provision contained in this Plan, the 2006 Sales Compensation Policies document and other related policies, will be made by the Sales Compensation Executive Counsel." (Def.'s

---

[2] Verizon Business' reliance on the *Workman* decision for the proposition that a disclaimer that is effective against a breach of contract claim is also effective against a promissory estoppel claim is misplaced because the promise at issue in *Workman* was in the employee handbook. *See Workman,* 234 F.3d at 1000 ("plaintiff relies for both his contractual claim and his claim for promissory estoppel on a handbook that UPS gives its employees explaining its employment policies."). As discussed, Martino maintains that Gross and Jacobi made the alleged promises at issue.

Stmt. Facts ¶ 39.)  Indeed, because Gross and Jacobi did not have the authority to interpret the 2006 Compensation Plan, Verizon Business could not be expected to anticipate their interpretations of the Plan, and thus Martino's reliance on the Jacobi's and Gross' interpretations was unexpected and unforeseeable.  *See, e.g., Ross v. May Co.,* 377 Ill.App.3d 387, 394, 316 Ill.Dec. 732, 880 N.E.2d 210 (Ill.App.Ct. 2007); *see also Doherty,* 47 F.Supp.2d at 991 (reliance on supervisor's statement unreasonable because supervisor lacked authority to make promise on company's behalf); *Cora v. Rancilio Macchine Per Caffe,* 01 C 3613, 2003 WL 21654152, at *7 (N.D. Ill. July 14, 2003) ("Plaintiffs cannot show that [company] could have foreseen or expected Plaintiffs' reliance on the supposed promise if [corporate officer] had no authority to make it.").  Accordingly, Martino has failed to fulfill the third element of a promissory estoppel claim under Illinois law.

As such, viewing the facts in favor of Martino – as the Court is required to do at this procedural posture – Martino has failed to establish two of the four elements of his promissory estoppel claim.  Thus, the Court grants Verizon Business' summary judgment motion as to Count III of the Complaint.

## III.    Illinois Wage Payment and Collection Act – Count II

In Count II of his Complaint, Martino seeks relief for his unpaid commissions under the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 *et seq*.  To bring a claim for compensation, including commissions, under the IWPCA, a plaintiff must show that he has "a right to compensation pursuant to an employment contract or agreement."  *Stark v. PPM Am., Inc.,* 354 F.3d 666, 672 (7th Cir. 2004); *see also* 820 ILCS 115/2.  Although under the IWPCA an "'agreement' is broader than a contract and requires only a manifestation of mutual assent on

the part of two or more persons," Martino nevertheless bases his IWPCA claim on the 2006

Compensation Plan. *See Zabinsky v. Gelber Group, Inc.,* 347 Ill.App.3d 243, 249, 283 Ill.Dec.

61, 807 N.E.2d 666 (Ill.App.Ct. 2004) ("Act provides an employee with remedies more

expansive than a common law breach of contract action"). Nonetheless, Martino's IWPCA

claim must fail because the Compensation Plan's disclaimers, as discussed above, are fatal to

Martino's claims that the Compensation Plan was an agreement or contract under the IWPCA.

*See Skelton v. American Intercontinental Univ. Online,* 382 F.Supp.2d 1068, 1075 (N.D. Ill.

2005) ("disclaimer is fatal to plaintiffs' claim that the handbook was a 'contract' to pay overtime

wages within the meaning of the IWPCA").

     Assuming that Martino and Verizon Business had an enforceable agreement based on the

2006 Compensation Plan, Martino's IWPCA claim still fails because Verizon Business paid

Martino the maximum amount of commissions that he was entitled to under the Compensation

Plan. Specifically, the 2006 Compensation Plan provides BSC IIIs, like Martino, with a target

commission of $60,000, which is "the annual commission amount that Plan Participants receive

should they achieve 100% of their performance objectives." (Def.'s Stmt. Facts ¶ 40.) The

target commission is made up of a Sales Component, which accounts for 80% of the target

commission, and a CPE Component, which accounts for the remaining 20% of the target

commission. (*Id.* ¶ 41.) Accordingly, if a BSC III were eligible to receive commissions in every

month of 2006 and achieved 100% of his performance objectives, he would be eligible to receive

$48,000 on the Sales Component and $12,000 on the CPE Component, for a total of $60,000. In

addition, the 2006 Compensation Plan caps a BSC III's commissions upon attaining 200% of his

performance objective. (*Id.* ¶ 42.) With a payout factor of 1.5 on the Sales Component, the

maximum payout of the Sales Component under the 200% cap is $144,000, which is the amount Verizon Business paid Martino in 2006. (*Id.* ¶¶ 46, 47.)

The CPE Component is calculated by multiplying the BSC III's objective attainment by a payout factor, referred to in the 2006 Compensation Plan as an "Incremental Payout Value." (*Id.* ¶ 43.) The payout factor for the CPE Component is multiplied by the percentage points of the BSC III's objective attainment. (*Id.* ¶ 45.) The payout factor for the CPE Component is $120 for each percentage point up to 100% and $180 for each percentage point above 100 %. (*Id.* ¶ 43.) In addition, the payout factor on the CPE Component "is prorated based on the Plan Participant's time in the BSC position." (*Id.* ¶ 44.) More specifically, a BSC III must remain in his position through the 16th day of the month to be eligible for commissions that month. (*Id.* ¶ 37.) As such, Martino was not eligible for CPE commissions in January 2006 because he did not work through January 16, 2006 due to his medical leave. (*Id.* ¶¶ 37, 53, 55, 56.) Likewise, Martino was not eligible for the CPE component for July 2006 because Verizon Business terminated his employment on July 14, 2006. (*Id.* ¶¶ 31, 37.) Therefore, Martino was eligible for commissions from February to June 2006, or 5/12 of the year. (*Id.* ¶ 31.) Because Martino achieved the maximum 200% of his performance objective for the CPE Component, his commissions were calculated by multiplying 100 percentage points by the $50 payout factor and the remaining 100 percentage points by the $75 payout factor – reflecting 5/12 of the year 2006. Accordingly, the maximum amount Martino could have earned on the CPE Component was $12,500, which is the amount that Verizon Business paid him. (*Id.* ¶ 46.) Therefore, the Court grants Verizon Business' summary judgment motion as to Count II of the Complaint because Verizon Business paid Martino the maximum amount of commissions pursuant to the 200% cap

under the 2006 Compensation Policies, and thus Martino has failed to establish that he has a right to additional compensation pursuant to the IWPCA.[3]

## IV.  Quantum Meruit/Unjust Enrichment – Count IV

Finally, in Count IV of his Complaint, Martino seeks to recover commissions over the 200% cap under the quasi-contract theories of quantum meruit and/or unjust enrichment even though Martino only worked for Verizon Business for approximately five months during 2006. "Quasi-contractual relief is available when one party has benefitted from the services of another under circumstances in which, according to the dictates of equity and good conscience, he ought not to retain such benefit." *Cromeens, Holloman, Sibert, Inc v. AB Volvo,* 349 F.3d 376, 397 (7th Cir. 2003) (quoting *Barry Mogul & Assoc., Inc. v. Terrestris Dev. Co.,* 267 Ill.App.3d 742, 205 Ill.Dec. 294, 643 N.E.2d 245, 251 (1994)); *see also HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.,* 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672 (Ill. 1989).  Under Illinois law, both quantum meruit and unjust enrichment apply when (1) "one party performs a service for another's benefit," (2) "the benefitting party accepts the benefit," and (3) "the circumstances surrounding the agreement indicate that the service was not intended to be gratuitous." *Midwest Emergency Assoc. – Elgin Ltd. v. Harmony Health Plan of Ill., Inc.,* 382 Ill.App.3d 973, 982, 321 Ill.Dec. 175, 888 N.E.2d 694 (Ill.App.Ct. 2008).

Here, the parties do not dispute that Martino provided Verizon Business with his services.  Instead, Verizon Business maintains that it paid Martino for the value of his services,

---

[3] Because Verizon Business did not pay Martino in excess of the 200% cap, the Court need not address Martino's argument that Verizon Business waived the requirement that commissions in excess of the 200% cap must be approved by the Commission Review Board under Section 5.6 of the Compensation Policies.

including, his salary, commission payments, and company-provided benefits. (Def.'s Stmt. Facts ¶¶ 5, 46.) Indeed, as discussed above, Verizon Business paid Martino commissions up to the 200% cap. As such, because Verizon Business paid Martino for the services that he provided as a BSC III, Martino fails to fulfill the third element of his quantum meruit/unjust enrichment claim. *See Beer Capitol Distrib., Inc. v. Guinness Bass Imp. Co.,* 290 F.3d 877, 881 (7th Cir. 2002) ("If the enriched party has paid for the value of the benefit received, no inequity results from retaining that benefit."); *see also Fischer v. First Chicago Capital Mkt., Inc.,* 195 F.3d 279, 284 (7th Cir. 1999).

Finally, although Martino argues that Verizon Business' actions were unfair because it should have paid him commissions over the 200% cap as provided by Section 5.6 of the Compensation Policies, Martino fails to develop the argument ***why*** – according to the dictates of equity and good conscience – Verizon Business should have paid him more for his services. *See Oshana v. Coca-Cola Co.,* 472 F.3d 506, 515 (7th Cir. 2006) (Illinois law of unjust enrichment requires a plaintiff to show that defendant's "retention of the profits would violate the fundamental principles of justice, equity, and good conscience."); *see also Cromeens,* 349 F.3d at 397. In short, Martino has failed to identify any uncompensated services that were of measurable benefit to Verizon Business for which he was not paid. *See, e.g., Cora,* 2003 WL 21654152, at *8; *see also Ogdon v. Hoyt,* 409 F.Supp.2d 982, 990 n.5 (N.D. Ill. 2006) (plaintiff "cannot survive summary judgment without evidence in support of his allegations, including that he provided services to defendant.").

Viewing the facts in a light most favorable to Martino, Martino has failed to present genuine issues of material fact for trial, and thus Martino's quasi-contract claims of unjust

enrichment and quantum meruit fail.  The Court grants Verizon Business' summary judgment motion as to Count IV of the Complaint.

## <u>CONCLUSION</u>

For these reasons, the Court grants Defendant's Motion for Summary Judgment.  The Court denies Defendant's Motion to Strike Certain Portions of Plaintiff's Response as moot.

**Dated:**  November 20, 2008

ENTERED

_____
**AMY J. ST. EVE**
**United States District Court Judge**